## City Court.

### *Trial Term—April*, 1885.

## EDWARD C. BRIDGMAN ET AL. *against* CHARLOTTE F. TROWBRIDGE.

The plaintiffs did business under the name of "The Railway Map and Publishing Co." The defendant gave one Taunton an order in the company's name for 1500 pamphlets. The contract was on an official blank of the company's on which thes name of B. C. Prescott appeared as general manager, and S. D. L. Taunton as superintendent. There was a printed memorandum on the head: "Make all checks payable to the order of B. C. Prescott." Taunton collected the entire bill from the defendant in installments in money and checks, some of the checks being made to the order of Prescott and some to the order of Taunton. Taunton subsequently, absconded, and the plaintiffs sued to recover the amount of the checks payable to Taunton's order, claiming the amount as a balance due on the contract, on the ground that Taunton had never accounted to the plaintiffs for the money. *Held*, that the payment to the superintendent was under the circumstances a good payment to the plaintiffs.

*Clark Brooks*, for plaintiffs.

*Johnes, Benner & Wilcox*, for defendant.

McADAM, Ch. J.—[Orally.]—Taunton was the superintendent of the plaintiffs, and was held out to the public as such on the bill-heads and printed contracts of the firm. The responsible position which he held as "superintendent" of the plaintiff's business was a recommendation to the outside public that he was a reliable man. He made the contract sued upon, in the name of the Railway Map & Publishing Co., and he made all the collections of money which were made thereon. The defendant, so far as the

testimony discloses, knew nothing of the plaintiffs, except that B. C. Prescott was the general manager of the Map Publishing Co., and that Taunton was its superintendent. Mr. Prescott told Mr. Taunton to collect this bill. He says he told Taunton to get a check for it, but it does not appear that the defendant was ever informed that there was any limit put upon Taunton's authority in the way of making collections ; that is, it does not appear that the defendant knew that Taunton was told to get a check. The defendant was under no obligation to give a check ; she had the right to pay in money, and the authority given to an agent to collect, includes every act necessary to a complete execution of the power, and authorizes the agent to collect in money, if the payment be made to him in that form. If a check be given to the agent on which the money is obtained by him, it has the same effect in law as if money had been paid in the first instance, because the result in each case is precisely the same.

Judge STORY, in his work on Agency, section 58, speaking of the mode of conferring authority on agents, says : " But whether it is conferred in the one way or the other, it is, unless the contrary manifestly appears to be the intent of the party, always construed to include all the necessary and usual means of executing it with effect. Thus, for example, if a general authority is given to collect, receive and pay all the debts due by or to the principal, it will occur to every one, who reflects upon the nature of such a trust, that numberless arrangements may be required fully to accomplish the end proposed ; such as settling accounts, adjusting disputed claims, resisting unjust claims, answering or defending suits ; and these subordinate powers (or, as they are sometimes called, mediate powers) are therefore, although not expressly given, understood to be included in, and a part of or incident to, the primary power. So, an authority given to recover and receive a debt, will authorize the attorney to arrest the debtor. So, an authority given to a broker to effect a policy, will

Bridgman v. Trowbridge.

authorize him to re-adjust a loss under that policy, and adopt all the means necessary to procure an adjustment. So, an arthority to settle losses on a policy will include a power to refer the matter to arbitration. So, an authority to sell and convey lands for cash, includes an authority to receive the purchase money. So, an authority to make and enter into contracts for the purchase of grain, has been held to include the power to modify or waive a contract made by the agent in respect to grain," and so on. So that, under these principles, the agent Taunton, even if told to get a check for the money, had the subordinate or mediate power, in order to effectually carry out the object of his agency, to take money or a check to his own order, which, so long as it produced money, is practically the same thing as money. The master or principal, which ever you prefer to call him, is, as a rule responsible, for the dishonest acts of the servants whom he selects, upon the principle, that if one of two innocent persons must suffer by the wrong or fraud of a third, the loss must fall upon the one who employed the fraud and clothed him with the credit which gave him the power to make the fraud successful.    The defendant has paid this bill; the plaintiffs' superintendent has proved dishonest.    Who shall suffer? his employers, or a stranger who innocently paid their chosen servant under the supposition he was paying them? The equities are so strongly with the defendant that there is hardly any use in reserving my decision for further consideration.    Every sense of justice requires that the defendant, having paid this bill once in good faith and without knowledge or notice that she was paying a dishonest servant, should not be required to pay it again. It follows therefore, that there must be judgment for the defendant.

This judgment was affirmed on appeal.   On the same point, see Scott v. Hopkins, 25 *Weekly Dig.* 110.